## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

PATRICIA MATTHEWS, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

WALMART INC.,

Defendant

Class Action Complaint

Jury Trial Demanded

Plaintiff Patricia Matthews ("Plaintiff") alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

## I.   DEMAND FOR "REAL INGREDIENTS" WITHOUT ADDITIVES

1.    In recent years, consumers are increasingly seeking healthier choices across the foods they buy.

2.    According to a food industry executive, "Consumers are reading product labels more closely, and we are seeing the effects of a simple food movement when it comes to ingredients."

3.    A growing number of consumers seek foods with the descriptor of "100%," understanding this term consistent with its dictionary definitions of "completely" or "entirely," without anything else added.[1]

---

[1] https://dictionary.cambridge.org/us/dictionary/english/one-hundred-percent
https://www.yourdictionary.com/one-hundred-percent

4.     This sentiment is reflected in the public's growing aversion to additives.

5.     Additives refer to non-food ingredients created in laboratories to fulfill various functions, such as facilitating processing ("processing aids"), improving appearance ("colorants"), creating or enhancing taste ("flavorings") and extending shelf-life and slowing deterioration ("preservatives").

6.     A recent consumer survey by the International Food Information Council ("IFIC") found that almost thirty percent of the public consider additives in food a top concern.[2]

7.     This aversion to additives is based on the belief that chemicals of any kind are not necessarily safe and may pose health risks.[3]

8.     According to one observer, "Our foods are laden with additives that are meant to enhance flavor, color and shelf life that research has shown are either bad for people to consume or inconclusively so."[4]

9.     Ingredient supplier Corbion observed that consumer awareness of the potentially harmful effects of additives means they are increasingly seeking foods

---

[2] Tom Neltner, Environmental Defense Fund, Chemicals Policy Director, Chemicals in food continue to be a top food safety concern among consumers, Food Navigator, Sept. 20, 2021.
[3] Cary Funk et al., Public Perspectives on Food Risks, Pew Research Center, Nov. 19, 2018.
[4] Frank Giustra, You Might Be Surprised by What's in Your Food, Modern Farmer, Feb. 8, 2021.

that "use 'real' ingredients, which is to say, those that are recognizable" and "naturally occurring," like 100 percent fruit juice.[5]

10.   This is because shoppers feel more comfortable when foods they buy contain ingredients they have in their own refrigerators, such as fruit and 100% fruit juice, instead of complex ingredients made in laboratories by chemists.

11.   Consumer research company Mintel attributed this demand for "real ingredients" in part due to media attention focused on lack of transparency in the food industry.[6]

12.   This behavior makes sense, as studies have confirmed negative health effects linked to foods laden with chemical additives.[7]

13.   According to ingredient supplier Corbion, consumer awareness of the potentially harmful effects of food additives means they are increasingly buying foods that "use 'real' ingredients, which is to say, those that are recognizable to consumers," like fruit and 100 percent fruit juice.[8]

---

[5] John Unrein, Ingredients on Alert: How Consumer Demand is Influencing Baking's Future, Bake Mag, Aug. 19, 2020.

[6] Lynn Dornblaser, Director, Innovation & Insight, Mintel, "Clean Label: Why this Trend is Important Now," 2017.

[7] Bhavana Kunkalikar, Processed danger: Industrial food additives and the health risks to children, News-Medical.net, May 23, 2023 (citing recent study in the Journal of the Academy of Nutrition and Dietetics, researchers explore the potential adverse health effects on children due to the use of industrial additives in processed food).

[8] John Unrein, Ingredients on Alert: How Consumer Demand is Influencing Baking's Future, Bake Mag, Aug. 19, 2020.

## II.   LEGAL BACKGROUND

14.   In response to an unregulated environment, where companies marketed their foods as containing the fruits and 100% fruit juice valued by consumers yet substituted ingredients of lesser economic and nutritive value, the Pure Food and Drug Act of 1906 established standards to protect the public.

15.   These requirements were strengthened by the Federal Food, Drug and Cosmetic Act ("FFDCA") in 1938. 21 U.S.C. § 301 *et seq.*

16.   Missouri adopted these laws through Ch. 196, Food, Drugs and Tobacco, of the Missouri Revised Statutes and accompanying regulations. MO Rev. Stat. § 196.010 *et seq.*; Missouri Code of State Regulations ("CSR"), 19 CSR § 20-1.045 ("Food Labeling").[9]

17.   These laws recognize that whether labeling of a food is misleading is based on "not only representations made or suggested by statement, word, design, device, sound, or in any combination thereof, but also the extent to which the labeling fails to reveal facts material in the light of such representations." Mo. Rev.

---

[9] The Missouri Food Code ("MFC") at 19 CSR § 20-1.025 encompasses other food labeling requirements, such as those for "Standards of Identity." 19 CSR § 20-1.025(1) (incorporating MFC by reference, available on state website).
MFC § 3-601.11 provides that "Packaged food shall comply with standard of identity requirements in 21 C.F.R. [Parts] 131-169 and 9 C.F.R. [Part] 319, Definitions and standards of identity or composition, and the general requirements in 21 C.F.R. Part 130 – Food Standards: General and 9 C.F.R. 319 Subpart A – General."

Stat. § 196.010(2).

18.   Congress empowered the Food and Drug Administration ("FDA") to develop rules, "premised on the simple notion that consumers value 'the real thing' versus a close substitute and should be able to rely on the label to readily distinguish between the two."[10]

19.   This was because "consumers initially [] rely on extrinsic cues such as visual information on labels and packaging" to provide sensory and nutritive information about what they were buying.[11]

## III.  PRODUCT LABELING

20.   To appeal to the growing number of consumers seeking foods that "use 'real' ingredients, which is to say, those that are recognizable to consumers," instead of lesser valued substitutes and manufactured chemical compounds, Walmart Inc. ("Defendant") markets single-serving cups of diced peaches described as "Yellow Cling Peaches in 100% Juice" under the Great Value brand ("Product").[12]

---

[10] Steven Steinborn, Hogan & Hartson LLP, Regulations: Making Taste Claims, PreparedFoods.com, August 11, 2006.

[11] Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Product Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations," Food Quality and Preference, 94 (2021): 104326.

[12] John Unrein, Ingredients on Alert: How Consumer Demand is Influencing Baking's Future, Bake Mag, Aug. 19, 2020 (discussing importance of ingredients generally as well as in baking).



21.   That the peaches are packed "In 100% Juice" is also expressed in a pink ribbon adjacent to the Great Value brand name, above "Diced Peaches."

22.   The label contains pictures of whole and cut peaches on a straw mat, a heaping spoon of diced peaches, with a visible cup of diced peaches in what appears to be only juice.

23.   However, the fine print of the ingredient list on the bottom of the package reveals purchasers do not receive only peaches and 100% juice.



**INGREDIENTS:** DICED PEACHES, <mark>WATER</mark>, WHITE GRAPE <mark>JUICE CONCENTRATE</mark>, LEMON <mark>JUICE CONCENTRATE</mark>, <mark>NATURAL FLAVOR</mark>, <mark>ASCORBIC ACID</mark> (VITAMIN C) TO PROTECT COLOR, <mark>CITRIC ACID</mark>.

24.   Though the ingredients, listed in order of predominance by weight, confirm the presence of peaches and juice, they reveal numerous undisclosed ingredients. 21 C.F.R. § 101.4(a).

25.   These include the second ingredient of added water, two kinds of "juice concentrate," "natural flavor," "ascorbic acid" and "citric acid."

A. <u>Added Water</u>

26.   Though water is a natural component of peaches and 100 percent fruit juice, the added water in the Product is from neither of these ingredients.

27.   The Product contains more water than any non-peach ingredient, including juice ingredients.

28.   This significant amount of added water reduces the quantity of peaches and "100% juice" consumers get, as water costs less than peaches and juice.

29.   Water lacks the nutrients of peaches and 100% fruit juice.

B. <u>Added Flavor and Seasoning</u>

30.   Though natural flavor is defined as "the essential oil, oleoresin, essence or extractive…which contains the flavoring constituents derived from a [] fruit [or

juice," this usually contains between 50 and 100 components, with solvents comprising over 80% of its volume. 21 C.F.R. § 101.22(a)(3).

31.   Though natural flavors can be obtained from peaches, the Product's added "natural flavor" is not from peaches, at least not in a way consumers would expect.

32.   To create what many have called this "mysterious additive," scientists in a laboratory isolate, concentrate, and synthesize proteins from the cells and tissue of fruits such as peaches, creating molecular compounds to replicate the taste of peaches using chemicals found in nature.

33.   The result is that "natural flavor" may contain some oil, protein, or essence from a peach, but mixed with additives and solvents, bearing little resemblance to the peaches it seeks to imitate.[13]

34.   Unfortunately for consumers, a chemical flavor manufactured to mimic the taste of peaches provides none of the health benefits of peaches, like antioxidants, fiber and vitamin C.

35.   Moreover, according to flavor expert Bob Holmes, an ingredient designated as "natural flavor" is unable to provide "all the flavor depth of the [peach] itself."

---

[13] Roni Caryn Rabin, Are 'Natural Flavors' Really Natural?, New York Times, Feb. 1, 2019.

36.   In canned peaches, lemon juice is a widely recognized seasoning ingredient. 21 C.F.R. § 145.170(a)(1)(iii) and 21 C.F.R. § 145.170(a)(4)(i).

C. Added Juice Concentrate

37.   Juice concentrate is made by removing all water and natural juice flavorings from fresh, 100% fruit juice.

38.   Months or years later, water and added flavorings are added back to turn it into "juice concentrate."

39.   Instead of adding back water from the fruit from which it was made, regular water is added to juice concentrates.

40.   Juice concentrate is understood by consumers to be of lesser quality than not from concentrate juice, because the former is subjected to harsh processing and long storage, which detracts from its nutritive and/or sensory value.

D. Added Synthetic Preservatives

41.   Until the early twentieth century, ascorbic acid and citric acid were obtained from fruits such as peaches and 100% fruit juice.

42.   However, neither the ascorbic acid nor citric acid used in the Product is from peaches or 100% fruit juice.

43.   Ascorbic acid is the synthetic version of vitamin C, obtained from genetically modified corn. 21 C.F.R. § 182.3013 ("Chemical Preservatives"); 7 C.F.R. § 205.605(b)(6) ("Synthetics allowed.").

9

44.   The glucose from the corn undergoes chemical reactions including hydrogenation, with synthetic substances, then is converted to sorbitol, before ascorbic acid is made.

45.   Like ascorbic acid, citric acid is also "a major industrial chemical," "made from *Aspergillus niger* (aka: black mold)…that comes [usually] from sugar sourced from genetically modified corn or beets."[14] 21 C.F.R. § 184.1033.

46.   Recovering citric acid requires numerous chemical reactions with synthetic mineral salts and reagents.

47.   First, the filtrate is treated with lime solution or calcium carbonate.

48.   This chemical reaction forms tri-calcium citrate tetra hydrate, treated with sulfuric acid in acidolysis reactors.

49.   Then, the solution is purified by passing through activated charcoal columns and ion exchangers.

50.   Finally, it is evaporated to recover citric acid.

51.   Ascorbic acid and citric acid are preservatives, a type of additive which slows deterioration of food.

52.   The FDA, aware of consumer desire for foods without preservatives, advised the public to check if a food's ingredients include the chemical additives of

---

[14] Nelson, What is Citric Acid, and is it Harmful to Your Health?, Branch Basics, Nov. 11, 2020.

"[A]scorbic acid [and] citric acid."[15]

53.  These ingredients are required to be followed by a description of their function, so consumers can make informed choices, "e.g., 'preservative', 'to retard spoilage', 'a mold inhibitor', 'to help protect flavor' or 'to promote color retention'." 21 C.F.R. § 101.22(j).

54.  Ascorbic acid and citric acid are used in the Product as preservatives, performing as acidulants, chelating agents, antimicrobial agents, buffering agents, antioxidant additives and anti-browning agents.

55.  Ascorbic acid and citric acid allow the Product to last longer on the shelves, and after it is opened for consumption.

56.  Ascorbic acid and citric acid are used in the Product to provide a fruity and tangy taste.

57.  This is necessary in part because juice concentrates are highly processed and may lose some of their natural fruit flavor.

58.  Ascorbic acid and citric acid are used in the Product to make it appear that it contains more peaches and 100% fruit juice than it does, by providing this fruity and tangy taste.

59.  By using ascorbic acid and citric acid, purchasers get a smaller amount of peaches and 100% fruit juice than they otherwise would and promised by the front

---

[15] Overview of Food Ingredients, Additives & Colors, Apr. 2010.

label.

## IV.  LABELING IS MISLEADING

60.   Though water, citric acid and ascorbic acid are naturally part of peaches and 100% fruit juice, the added water and ascorbic acid are not from peaches or 100% fruit juice.

61.   The substitution of the promoted ingredients of peaches and 100% fruit juice with added water, juice concentrates, natural flavor, added seasoning in the form of lemon juice and the synthetic preservatives of ascorbic acid and citric acid, is of material interest to consumers, because the former cost more than these lower quality alternatives.

62.   The substitution of the promoted ingredients of peaches and 100% fruit juice with added water, juice concentrates, natural flavor, added seasoning in the form of lemon juice and the synthetic preservatives of ascorbic acid and citric acid, is of material interest to consumers, because the former contain more nutrients and are natural ingredients, while the latter contain fewer, if any nutrients, and are synthetic and artificial.

63.   The Product is "misbranded" and misleads consumers because its labeling as "Yellow Cling Peaches in 100% Juice" causes them to expect only peaches and 100% juice, when this statement is false, due to the presence of added water, juice concentrates, natural flavor, added seasoning in the form of lemon juice

and the synthetic preservatives of ascorbic acid and citric acid. 21 U.S.C. § 343(a)(1); Mo. Rev. Stat. § 196.075(1).

64.   The Product is "misbranded" and misleads consumers because "it purports to be or is represented as a food for which a definition and standard of identity has been prescribed," but does not "conform[] to such definition and standard, [nor does] its label bear[] the name of the food specified in the definition and standard." 21 U.S.C. § 343(g); Mo. Rev. Stat. § 196.075(7).

65.   As a food subject to the "Canned peaches" standard of identity, the Product's labeling is required to conform to this standard. 21 C.F.R. § 145.170.

66.   The name of "Yellow Cling Peaches in 100% Juice" fails to "include a declaration of any flavoring that characterizes the product as specified in § 101.22," because it does not disclose the addition of "natural flavor," added to simulate a peach taste. 21 C.F.R. § 145.170(a)(4)(i).

67.   Federal and state regulations require that because the Product is represented as "Yellow Cling Peaches," yet uses "natural flavor" to imitate and simulate the taste of peaches, "Yellow Cling Peaches" "may be immediately preceded by the word 'natural' and shall be immediately followed by the word 'flavored'…e.g., 'Natural [Yellow Cling] Flavored [Peaches]' or '[Yellow Cling] Flavored [Peaches].'" 21 C.F.R. § 101.22(i)(1)(i).

68.   Federal and state regulations require that because the Product is

represented as "Yellow Cling Peaches," yet uses seasoning in the form of lemon juice concentrate, "Yellow Cling Peaches" "shall also include…a declaration of any [] seasoning that characterizes [it] for example, 'Seasoned with [lemon juice],'… [one] of the optional ingredients specified in [21 C.F.R. §§ 145.170(a)(1)(ii), (iii), (iv) and (v)]." 21 C.F.R. § 145.170(a)(4)(i).

69.   Federal and state regulations require that "the name of the packing medium specified in [21 CFR 145.170(a)(3)(i)-(ii)], preceded by 'In' or 'Packed in'…shall be included as part of the name [of Yellow Cling Peaches] or in close proximity to the name of [of Yellow Cling Peaches]." 21 C.F.R. § 145.170(a)(4)(ii).

70.   Since "the liquid portion of the packing media provided for in [21 CFR 145.170(a)(3)(i)-(ii)] consists of" "Fruit juice(s) and water," this must be disclosed as part of the Product's name. 21 C.F.R. § 145.170(a)(4)(ii); 21 C.F.R. § 145.170(a)(3)(i)(b).

71.   Since the packing medium includes "WHITE GRAPE JUICE CONCENTRATE [and]…LEMON JUICE CONCENTRATE," "a combination of two or more fruit juices [both] of which are made from concentrate(s), the words 'from concentrate(s)' shall follow the word 'juices(s)' in the name of the packing medium," such as "In White Grape Juice From Concentrate and Lemon Juice From Concentrate," or "In Fruit Juice From Concentrate." 21 C.F.R. §§ 145.170(a)(4)(ii)(b)-(c)

14

72.   If "In Fruit Juice From Concentrate" was used, and "the names of the fruit juices used do not appear in the name of the packing medium as provided in [21 C.F.R. § 145.170(a)(4)(ii)(b)], such names [of white grape juice and lemon juice] and the words 'from concentrate,' as specified in [21 C.F.R. § 145.170(a)(4)(ii)(c)], shall appear in [the Product's] ingredient statement." 21 C.F.R. § 145.170(a)(4)(iii).

73.   Since the packing medium includes "Fruit juice(s) and water," a truthful and non-misleading description of the packing medium could be "In Water, White Grape Juice From Concentrate and Lemon Juice From Concentrate," or "In Water and Fruit Juice From Concentrate." 21 C.F.R. § 145.170(a)(3)(i)(b); 21 C.F.R. § 145.170(a)(3)(ii) (model language for how added water should be disclosed as part of packing medium but when it contains more fruit juice than water).

74.   The Product is "misbranded" and misleads consumers because "it bears or contains [] chemical preservative[s] [of ascorbic acid and citric acid] [and does not] bear[] labeling stating that fact." 21 U.S.C. § 343(k); Mo. Rev. Stat. § 196.075(11).

75.   Ascorbic acid and citric acid are recognized as chemical preservatives by the FDA.

76.   Ascorbic acid and citric acid are "chemical[s] that, when added to food, tends to prevent or retard deterioration thereof" and function in this capacity in the Product. 21 C.F.R. § 101.22(a)(5).

77.   The labeling of ascorbic acid on the ingredient list attempts to comply with the requirement that the Product "bear[s] a label declaration stating both the common or usual name of the ingredient(s) [of ascorbic acid] and a separate description of its function, e.g., ['TO PROTECT COLOR']," no such similar "separate description of its function" follows the listing of citric acid, such as "preservative" or "to help protect flavor." 21 C.F.R. § 101.22(j).

78.   Moreover, even disclosure of these chemical preservatives on the Product's ingredient list does not "render such statement likely to be read by the ordinary person under customary conditions of purchase and use of such food," because most consumers do not read the fine print ingredients. 21 C.F.R. § 101.22(d).

79.   The Product is "misbranded" and misleads consumers because the front label does not contain the "word[s], statement[s], or other information required," as described above. 21 U.S.C. § 343(f); Mo. Rev. Stat. § 196.075(6).

80.   This includes the Product's name of "Yellow Cling Peaches," which is required to instead state, "Natural Yellow Cling Flavored Peaches Seasoned With Lemon Juice Concentrate" or "Yellow Cling Flavored Peaches Seasoned With Lemon Juice Concentrate."

81.   This includes the Product's packing medium of "In 100% Juice," which is required to instead state, "In Water, White Grape Juice From Concentrate and

Lemon Juice From Concentrate" or "In Water and Fruit Juice From Concentrate."

82.   This includes the Product's listing of "citric acid" on the ingredient list, which is required to instead state, "citric acid, a preservative" or "citric acid, to help protect flavor."

## V.   CONCLUSION

83.   The label statements of "Yellow Cling Peaches In 100% Juice" and "In 100% Juice," along with the pictures of peaches on a straw mat, and the visible cup seemingly filled with peaches and 100% fruit juice, tells purchasers they are buying only diced yellow cling peaches in 100% fruit juice.

84.   Instead, consumers get unexpected ingredients of water, juice concentrates, natural flavor, lemon juice for seasoning, ascorbic acid and citric acid.

85.   Water, juice concentrates, natural flavor, lemon juice for seasoning, ascorbic acid and citric acid cost less than peaches and 100% fruit juice.

86.   Water, juice concentrates, natural flavor, lemon juice for seasoning, ascorbic acid and citric acid lack the nutrients of peaches and 100% fruit juice.

87.   Water, juice concentrates, natural flavor, lemon juice for seasoning, ascorbic acid and citric acid lack the taste of peaches and 100% fruit juice.

88.   By adding water, juice concentrates, natural flavor, lemon juice for seasoning, ascorbic acid and citric acid, consumers get a smaller amount of peaches and 100 percent fruit juice promised from the front label.

89.   As a result of the false and misleading representations, the Product is sold at a premium price, at or around $2.48 for four 4 oz cups, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION

90.   Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

91.   The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

92.   Plaintiff is a citizen of Missouri.

93.   Defendant is a citizen of Delaware based on its corporate formation.

94.   Defendant is a citizen of Arkansas based on its principal place of business.

95.   The class of persons Plaintiff seeks to represent includes persons who are citizens of a different state from which Defendant is a citizen.

96.   The members of the proposed class Plaintiff seeks to represent are more than one hundred, because the Product has been sold at the approximately 137 Walmart stores in this State and online to citizens of this State.

97.   The Court has jurisdiction over Defendant because it transacts business within Missouri and sells the Product to consumers within Missouri from the

approximately 137 Walmart stores in this State and online to citizens of this State.

98.   Defendant transacts business in Missouri, through the sale of the Product to citizens of Missouri from the approximately 137 Walmart stores in this State and online to citizens of this State.

99.   Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

100. Defendant has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

101. Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, amount and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

## VENUE

102. Venue is in this District with assignment to the Eastern Division because

a substantial or the entire part of the events or omissions giving rise to these claims occurred in Saint Charles County, which is where Plaintiff's causes of action accrued.

103. Plaintiff purchased, used and/or consumed the Product in reliance on the labeling identified here in Saint Charles County.

104. Plaintiff first became aware the labeling was false and misleading in Saint Charles County.

105. Plaintiff resides in Saint Charles County.

## PARTIES

106. Plaintiff Patricia Matthews is a citizen of Saint Charles County, Missouri.

107. Defendant Walmart Inc. is a Delaware corporation with a principal place of business in Arkansas.

108. Walmart is an American multinational retail corporation that operates a chain of over 5,000 supercenters throughout the nation, with almost four hundred in Missouri, selling everything from furniture to electronics to groceries.

109. While Walmart sells leading national brands of products, it also sells many products under one of its private label brands, Great Value.

110. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

111. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

112. Products under the Great Value brand have an industry-wide reputation for quality.

113. In releasing products under the Great Value brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

114. Walmart gets national brands to produce its private label items due its loyal customer base and tough negotiating.

115. Private label products under the Great Value brand benefit by their association with consumers' appreciation for the Walmart brand overall.

116. That Great Value branded products met this high bar was proven by focus groups, which rated them above their name brand equivalent.

117. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands [like Great Value] are good alternatives to national brands, and more than 60 percent consider them to be just as good."

118. Private label products generate higher profits for retailers like Walmart because national brands spend significantly more on marketing, contributing to their higher prices.

119. The development of private label items is a growth area for Walmart, as they select only top suppliers to develop and produce Great Value products.

120. Plaintiff purchased the Product between January 2019 and January 2024, at Walmart locations in Saint Charles County, and/or other areas.

121. Plaintiff is like most consumers who tries to buy foods which prominently represent that their components are the types of natural ingredients they will have at home and are familiar with, like peaches and 100% fruit juice.

122. Plaintiff is like most consumers who tries to avoid additives based on a belief that they are potentially harmful, not natural and unhealthy.

123. Plaintiff understood 100% juice to mean only fruit juice, without any flavorings or preservatives.

124. Plaintiff understood 100% juice to mean only not from concentrate fruit juice, because in her experience, the use of juice concentrate is typically disclosed on a product's label.

125. Plaintiff read and relied on the label statements of "Yellow Cling Peaches in 100% juice" and "In 100% Juice," the pictures of whole and cut up peaches, and the cut-up peaches inside the visible container, which appeared to show only 100% juice.

126. Plaintiff did not expect that in addition to the pictured peaches and 100% fruit juice, the Product's main liquid ingredient would not be juice but water.

127. Plaintiff did not expect the fruit juice used would be juice concentrate, from which the water was removed.

128. Plaintiff did not expect that in addition to peaches and 100% fruit juice, the Product would contain additives, like natural flavor and synthetic ascorbic acid and citric acid.

129. Plaintiff bought the Product at or exceeding the above-referenced price.

130. Plaintiff paid more for the Product than she would have had she known it did not only contain peaches and 100% juice, as she would not have bought it or would have paid less.

131. The Product was worth less than what Plaintiff paid, and she would not have paid as much absent Defendant's false and misleading statements and omissions.

## CLASS ALLEGATIONS

132. Plaintiff seeks to represent the following class:

> All persons in Missouri who purchased the Product in Missouri during the statutes of limitations for each cause of action alleged.

133. Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediate family members of any of the foregoing persons, (b) governmental entities, (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself

or herself from the Class.

134. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

135. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

136. Plaintiff is an adequate representative because her interests do not conflict with other members.

137. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

138. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

139. The class is sufficiently numerous, with over 100 members, because it has been sold throughout the State for several years with the representations and omissions identified here.

140. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

## COUNT I
Missouri Merchandising Practices Act ("MPA")

<u>Mo. Rev. Stat. § 407.025, *et seq*.</u>

141. Plaintiff incorporates by reference paragraphs 1-69.

142. The purpose of the MPA is to protect consumers against unfair and deceptive practices.

143. The MPA considers any unfair or deceptive acts or practices in the conduct of any trade or commerce to be unlawful.

144. Violations of the MPA can be based on the principles of the Federal Trade Commission Act ("FTC Act") and FTC decisions with respect to those principles. 15 U.S.C. § 45 *et seq*.; 15 CSR § 60-8.020(1).

145. In considering whether advertising is misleading in a material respect, the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations." 15 U.S.C. § 55(a)(1).

146. In considering whether a food's label is misleading, it is required to consider "not only representations made or suggested by statement, word, design, device, sound, or in any combination thereof, but also the extent to which the labeling fails to reveal facts material in the light of such representations." Mo. Rev. Stat. § 196.010(2).

147. Defendant's false and deceptive representations and omissions with respect to the Product's contents, peaches and 100% fruit juice, are material in that

they are likely to influence consumer purchasing decisions.

148. This is because consumers prefer foods with wholesome, natural and nutritious  ingredients promoted on their front labels, like peaches and 100% fruit juice, instead of having those ingredients replaced with water, juice concentrates, added flavoring and seasoning, and synthetic preservatives.

149. The labeling of the Product violated the FTC Act and thereby violated the MPA because the representations and omissions of "Yellow Cling Peaches In 100% Juice" and "In 100% Juice," across a package showing cut up peaches and the visible packing medium which appeared to be 100% fruit juice, created the erroneous impression it contained only peaches and 100% fruit juice, when this was false, because it contained mostly other ingredients, such as added water, present in an amount greater than any fruit juice, juice concentrates, added flavoring and seasoning, and synthetic preservatives.

150. Violations of the MPA can be based on public policy, established through statutes, law or regulations.

151. The labeling of the Product violates laws, statutes, rules and regulations that are intended to protect the public. 15 CSR § 60-8.090(1)(A).

152. The labeling of the Product violated the MPA because the representations and omissions of "Yellow Cling Peaches In 100% Juice" and "In 100% Juice," on a straw mat showing cut up peaches and the visible packing medium

26

which appeared to be 100% juice, when it contained mostly other ingredients, such as added water, present in an amount greater than any fruit juice, juice concentrates, added flavoring and seasoning, and synthetic preservatives, was contrary to Ch. 196, Food, Drugs and Tobacco, of the Missouri Revised Statutes and accompanying regulations, which adopted the FFDCA and accompanying regulations, the purpose of which was to promote "honesty and fair dealing" to the public. MO Rev. Stat. § 196.010 *et seq*.; 19 CSR § 20-1.045.

153. The FFDCA and its regulations prohibit consumer deception by companies in the labeling of food. 15 CSR § 60-8.090(1)(A).

154. These include the following federal and state laws and regulations described above.

| Federal | State |
|---|---|
| 21 U.S.C. § 343(a)(1) | Mo. Rev. Stat. § 196.075(1) |
| 21 U.S.C. § 343(f) | Mo. Rev. Stat. § 196.075(6) |
| 21 U.S.C. § 343(g) | Mo. Rev. Stat. § 196.075(7) |
| 21 U.S.C. § 343(k) | Mo. Rev. Stat. § 196.075(11) |
| 21 C.F.R. § 101.22(d) | |
| 21 C.F.R. § 101.22(i)(1)(i) | 19 CSR § 20-1.045 |
| 21 C.F.R. § 101.22(j) | |
| 21 C.F.R. § 145.170(a)(4)(i) | 19 CSR § 20-1.025(1) |
| 21 C.F.R. § 145.170(a)(4)(ii)(b) | 19 CSR § 20-1.045 |

21 C.F.R. § 145.170(a)(4)(ii)(c)      MFC § 3-601.11

155. Plaintiff believed the Product contained only fruit and 100% fruit juice, even though it contained mostly other ingredients, such as added water, present in an amount greater than any fruit juice, juice concentrates, added flavoring and seasoning, and synthetic preservatives.

156. Plaintiff paid more for the Product and would not have paid as much if she knew that it did not contain only peaches and 100% fruit juice, but mostly other ingredients, such as added water, present in an amount greater than any fruit juice, juice concentrates, added flavoring and seasoning, and synthetic preservatives.

157. Plaintiff seeks to recover for economic injury and/or loss she sustained based on the misleading labeling and packaging of the Product, a deceptive practice under the MPA.

158. Plaintiff will produce evidence showing how she and consumers paid more than they would have paid for the Product, relying on Defendant's representations and omissions, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis and other advanced methodologies.

159. As a result of Defendant's misrepresentations and omissions, Plaintiff was injured and suffered damages by her payment of a price premium for the Product, which is the difference between what she paid based on its labeling and marketing, and how much it would have been sold for without the misleading

28

representations and omissions identified here.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   February 7, 2024

Respectfully submitted,

/s/ Daniel F. Harvath
Harvath Law Group LLC
75 W Lockwood Ave Ste 1
Webster Groves MO 63119
(314) 550-3717
dharvath@harvathlawgroup.com

*Notice of Lead Counsel Designation:*

*Lead Counsel for Plaintiff*

Daniel F. Harvath

Harvath Law Group LLC

*Counsel for Plaintiff*